UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| UNITED STATES OF AMERICA, | ) |
|---|---|
| Plaintiff, | ) |
| vs. | ) Cause No. 1:07-cv-1167-WTL-DML |
| THOMAS J. RITZ, et al., | ) |
| Defendants. | ) |

**ENTRY ON MOTION FOR SUMMARY JUDGMENT**

In the fall of 2010, the Court learned that Defendant Thomas Ritz ("Thomas") had not been receiving communications related to this case. Accordingly, in November 2010, the Court set aside the summary judgment ruling against Thomas to allow him to respond to the Government's Motion for Summary Judgment (Docket No. 79). Having done so, the Government's motion is now fully briefed, and the Court being duly advised, now **GRANTS IN PART AND DENIES IN PART** the motion for the reasons set forth below. The Defendant's Motion to Enforce the Settlement Agreement (Docket No. 122) is **DENIED**.

**I. SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party

who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *see also* FED. R. CIV. P. 56(e)(2). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Methodist Med. Ctr. of Ill. v. Am. Med. Sec., Inc.*, 38 F.3d 316, 319 (7th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The non-moving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Wolf v. Northwestern Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001), *cert. denied*, 534 U.S. 1028 (2001). "[T]he court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

In evaluating a motion for summary judgment, although the court draws all reasonable inferences from undisputed facts in favor of the nonmoving party and views the disputed evidence in the light most favorable to the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute; "instead, the nonmoving party must present definitely, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). "If the nonmoving party fails to make a sufficient showing on an essential element of her case, the moving party is entitled to judgment

as a matter of law because 'a complete failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial.'" *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## II.  BACKGROUND

The Cottonwood Campground (the "Campground") is located in Cedar Grove, Indiana. The Campground, which is open from mid-May through mid-October, is comprised of between fifty and eighty campsites,[1] each of which has a water spigot and a sewer hookup for campers or recreational vehicles. The water spigots at the campsites are marked "non-potable." The Campground also has two restrooms with sinks, toilets, and hot showers.

In 1984, Thomas purchased the Campground, along with some additional property, from George and Ellen Winters. Thomas ran the Campground for a short time before selling it to his brother Ronald Ritz in 1986.

In 1998, the Environmental Protection Agency ("EPA") issued an Administrative Order (the "Order") related to the Campground. This Order, which the Defendants deny receiving, ordered the Campground to, among other things, sample the Campground's water system for nitrate and total coliform. The Order also required the Defendants to notify individuals served by the Campground's water system of the failure to monitor the system. By its own terms, the Order was to terminate on January 31, 2000, if the Defendants continuously complied with its provisions.

---

[1] Thomas testified that the Campground had between seventy and eighty campsites. Docket No. 79 Ex. 1 at 107-08. His brother and co-Defendant Ronald Ritz testified that the Campground had only fifty or sixty campsites. Docket No. 79 Ex. 2 at 70-71.

3

From 2002 onward, the Defendants tested the water for nitrate once or twice. They only tested for total coliform twice – once on June 12, 2003 and again on June 25, 2003.

In 2007, the Government filed this Safe Drinking Water Act ("SDWA") enforcement action seeking injunctive relief and civil penalties. In May 2009, the parties reported that they had settled this case. In the Settlement Agreement, the parties agreed: (1) to execute a consent decree to "to include third party testing of nitrate and TCR for a period of three (3) years for any calendar quarter that the [C]ampground is open or operating"; (2) that the Defendants will pay a "[s]ettlement amount of $5,000 within one (1) month of execution of the Final Consent Decree plus $2,500 within one (1) year of execution of the Final Consent Decree"; and, (3) that there will be "[n]o admission of liability under the Safe Drinking Water Act." Docket No. 123 at 2.

In April 2010, after the parties were unable to agree about what terms to include in the Final Consent Decree (the "Consent Decree"), the Government moved to enforce the Settlement Agreement. The Government's motion essentially sought to enforce its version of the Consent Decree with or without the Defendants' signatures. The Magistrate Judge held a hearing on the Government's motion in May 2010, and ultimately denied the motion.[2] In July 2010, after the parties reported that they were ultimately unable to resolve issues surrounding the Consent Decree, the Court reopened the parties' fully-briefed dispositive motions. *See* Docket No. 103 at 1. Then, in August, the Court denied the Defendants' motion for summary judgment (Docket No. 58) and granted the Government's cross-motion for summary judgment (Docket No. 79). *See* Docket No. 105.

---

[2] At this hearing the Magistrate Judge also granted Thomas' attorney's motion to withdraw (Docket No. 97).

4

Unfortunately, because Thomas did not have counsel and had not been receiving notices from the Court, Thomas did not receive an opportunity to respond to the Government's motion. Accordingly, in November 2010, after the Court was made aware of this situation it set aside its previous order (Docket No. 105) as to Thomas only. Thomas has now retained counsel and has responded to the Government's motion. He has also filed his own motion to enforce the Settlement Agreement.

### III. DISCUSSION

**A.   Thomas' motion to enforce the Settlement Agreement.**

In November 2010, Thomas moved to enforce the Settlement Agreement. Although he concedes that the parties have been unable to agree about terms of a Consent Decree, he argues that this does not preclude enforcing the underlying Settlement Agreement. However, Thomas' argument ignores the fact that the Settlement Agreement is simply not enforceable on its face because it clearly contemplates the execution of another document (the Consent Decree). Final settlement of the case was contingent on the execution of the Consent Decree. At best, the Settlement Decree was an "agreement to agree," which is not enforceable. *See Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996). Accordingly, Thomas' Motion to Enforce the Settlement Agreement is **DENIED**.

**B.   The Government's motion for summary judgment.**

**1.   The SDWA applies to the Campground.**

In its motion for summary judgment, the Government asserts that the Campground is subject to the SDWA because it is a public water system ("PWS"). The SDWA defines a PWS as "a system for the provision to the public of water for human consumption through pipes or

other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals." 42 U.S.C. § 300f(4)(A). The relevant regulation states:

> PWS means a system for the provision to the public of water for human consumption through pipes or, after August 5, 1998, other constructed conveyances, if such system has at least fifteen service connections or regularly serves an average of at least twenty-five individuals daily at least 60 days out of the year.

40 C.F.R. § 141.2.

The Government argues that the undisputed evidence indicates that the Campground contains at least fifty water spigots, far more than the fifteen required for a PWS.[3] *See* Docket No. 79 Ex. 1 at 107-08; Docket No. 79 Ex. 2 at 70-71. In response, Thomas claims that although there are at least fifty water spigots at the Campground, a spigot is not a service connection. In support of this argument, Thomas cites the Indiana Administrative Code (the "IAC"), which lists a campground as a type of service connection. However, Indiana state law is neither binding nor at issue here. This is a federal suit brought pursuant to a federal statute – the SDWA. Were this a suit for violation of Indiana's environmental laws, perhaps the cited provision of the IAC would be more persuasive.

Equally unavailing are two communications that Thomas received from two different environmental officials. One fax, from the EPA's regional office in Chicago states: "Per Tom's voicemail and question about whether an RV park/campground *with 1 service connection* and 55 spigots . . . is a public water system under federal regulations, my understanding of the federal

---

[3] The Government does not argue that the Campground regularly serves at least twenty-five individuals daily at least sixty days out of the year. Instead, it relies solely on the fifteen service connections clause to support its conclusion that the Campground is a PWS.

definition at 40 CFR 141.2 is that such a system would not be considered a public water system."
Docket No. 115 Ex. 1 at 1 (emphasis added).  The EPA's answer appears based on the assumption that the Defendants' Campground only has one service connection.  However, nothing in either the document or the record as a whole suggests that the EPA made any determination that the Campground had only a single service connection.

The document received from the State of Tennessee's Department of Environment and Conservation (Docket No. 115 Ex. 3 at 1) is equally unavailing.  This document addresses only the definition of a PWS pursuant to Tennessee state law, which is not at issue here.

Having viewed the evidence of record in the light most favorable to Thomas, the non-moving party, it is undisputed that the Campground contains at least fifty water spigots, far more than the fifteen required for a PWS.  Accordingly, the Campground is a PWS and is subject to the SDWA.  To the extent that the Government moved for summary judgment as to the applicability of the SDWA, the Government's motion is **GRANTED**.

### 2.     Thomas is neither an "owner" nor an "operator" of a PWS.

The SDWA applies to owners and operators of PWSs, as well as suppliers of water, which are defined as: "any person who owns or operates a public water system."  42 U.S.C. § 300f(5).  Unfortunately, neither "owner" nor "operator" is defined in either the statute or the regulations.

In the instant case, the Government concedes that Thomas is not an "owner" of a PWS, as it is undisputed that he sold the Campground to his brother Ronald in 1986.  Instead, the Government vigorously argues that Thomas is an "operator" of a PWS.  The Government asserts that the *United States v. Bestfoods*, 524 U.S. 51 (1998), definition of "operator" applies to the

7

SDWA. The *Bestfoods* suit involved the Comprehensive Environmental Response and Liability Act ("CERCLA"), another federal environmental statute. Like the SDWA, CERCLA uses, but does not define, the phrase "owner or operator." In *Bestfoods*, the Supreme Court concluded that the statutory definition was essentially useless; therefore, the Court applied the rules of statutory construction to "give the term its 'ordinary or natural meaning.'" *Bestfoods*, 524 U.S. at 66 (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)). The Court explained that, "in the organizational sense more obviously intended by CERCLA, the word [operator] ordinarily means '[t]o conduct the affairs of; manage: *operate a business*.'" *Id*. at 66 (quoting AMERICAN HERITAGE DICTIONARY 1268 (3d ed. 1992)). Accordingly, under CERCLA,

> an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id*. at 66-67.

Applying the same type of plain language construction to the definition of "operator" in the SDWA, the Court concludes that an operator is someone who manages, directs, or conducts operations specifically related the PWS's compliance with, or violation of, the SDWA. *See United States v. Alisal Water Corporation*, 114 F.Supp.2d 927, 937-38 (N.D. Cal. 2000) (applying same definition).

Here, the Government claims that "Thomas Ritz was involved in the day-to-day operations of the Campground, and that he was also involved in decisions about whether to comply with the SDWA and the EPA's Administrative Orders." Docket No. 130 at 11. Specifically, the Government cites Thomas' role as manager of the Campground, his alleged

8

responsibility for "issues related to the water and water testing on the property," *id.*, his presence at the Campground when the EPA served a 2001 search warrant, and his discussions with a contractor about installing a water line at the Campground, as evidence that Thomas was an operator of the Campground's PWS.

The Government's argument largely ignores or misinterprets Thomas' deposition testimony. When asked about his current role at the Campground, Thomas consistently identified himself as a maintenance man or maintenance manager:

> **Q: Did you ever do any work at the campground?**
> A: Light maintenance.
> **Q: Like what?**
> A: Like construction. If a tree blew down, I'd cut the tree up. I did it for all the properties owned by the Ritz family, up and down the road.
> **Q: Anything else you did to help out at the campground?**
> A: Any kind of light maintenance. That's it. General maintenance. That's it.

Docket No. 79 Ex. 1 at 8.

> **Q: Under superintendent here it says Tom, hyphen MGR.**
> A: Yeah.
> **Q: What does that mean?**
> A: I did the maintenance on all the properties, maintenance manager.
> **Q: That's what you meant by MGR?**
> A: Yes.

*Id.* at 11.

> **Q: So you listed yourself here as manager?**
> A: Of the maintenance, right.
> **Q: Well, it doesn't say maintenance, does it?**
> A: No, it doesn't but that's what that meant.

*Id.*

Thomas also explained that because the Campground is a family-operated business, everyone pitched in to help, which meant that sometimes he would help out collecting money if

he was there. *See* Docket No. 79 Ex. 1 at 9 ("I've helped out in that over the years. But it could be, I think, any member of the family could help out in that regard."). However, his roles contributing where necessary by taking money and conducting maintenance on the property do not justify deeming him an operator of the Campground's PWS.

With respect to the water sampling, Thomas readily admitted that he occasionally took water samples of the Campground's water. However, he firmly denied that he was responsible for sending in the samples or obtaining the results.

> **Q: Do you see that one? Cottonwood Campground. Do you know whose handwriting this is on this part of the form?**
> A: On the top is not mine. On the bottom I took the [water] sample that time.
> **Q: How do you know that?**
> A: Because that's my writing, my printing.

Docket No. 79 Ex. 1 at 10-11.

> **Q: All right. I'm going to ask you a few questions about the water testing and sampling that we talked about a minute ago. And you said that you helped out with that from time to time. What was your involvement in that?**
> A: Well, if I was down there and they needed a sample, and maybe one of the members wasn't about to do it, I'd help out, take a sample.
> **Q: What would you do exactly?**
> A: Well, I guess there was a company that gave bottles out, you know. And I guess you fill them up and send them to the company.
> **Q: Do you remember what company you sent them to?**
> A: I didn't send them. I might have taken a sample for them. I can't remember.

Docket No. 130 Ex. 2 at 5.

> **Q: So what was your understanding – when you were taking the samples, what was your understanding of who you were sending them to and why?**
> A: I wasn't. I might have taken the sample to help out the family members once or twice. You know, I might have been down there doing some maintenance and they said here, get a sample before you leave, that type of thing. I didn't send the samples, and I wasn't recording the results or anything like that.

*Id.*

> **Q: And this is September 4, '01 you took this sample?**
> A: Yes.
> **Q: And so when you took the sample, were you responsible for mailing it to in [sic] Sherry Laboratories?**
> A: No, I didn't.
> **Q: You don't think you're the one that sent it in?**
> A: No. I was down there and took the sample for them. I don't know if my brother sent it, I don't know who sent it.

*Id.* at 6.

As to his presence at the Campground on the day the property was searched, Thomas explained: "That day I was holding the office for the canoe rental." Docket No. 130 Ex. 2 at 8. Again, Thomas' presence (at the office of another family enterprise surreptitiously located at the Campground) does not justify deeming him an operator of the Campground's PWS.

Finally, Thomas stated that the reason he (and not his brother Ronald or another family member) spoke with a contractor about installing a water line to the Campground was because the contractor was working at Thomas' private residence so Thomas inquired about the cost to do work at the Campground.

> **Q: Have you ever talked to Steve [Roamer] about this lawsuit?**
> A: Never.
> **Q: Have you ever talked to him about the campground?**
> A: . . . He came to me, where I live on Seeley Road, which he came to me and wanted to dig up my front yard to put an extra waterline in. That's where the conversation started. I already have a waterline. He wanted another one because they were building down the road another development. And he said, "Would that be possible?" And I said, "Sure." So no charge to him. He dug up my whole front yard, no advantage to me. And that's when that conversation started. I didn't seek him out. I said, you know, our family would get a bid what it would cost to put in a water system, which we wound up doing.

Docket No. 79 Ex. 1 at 12.

Taken in context, and viewed in the light most favorable to Thomas, all of these statements indicate that there is at least a question of fact as to whether Thomas was someone

who managed, directed, or conducted operations related to the Campground's compliance with the SDWA. Given this question of fact, to the extent that the Government's motion seeks summary judgment as to Thomas' status as either an owner or an operator of a PWS, the motion is **DENIED**.

### 3. Other arguments.

In addition to the arguments above, Thomas argues that 42 U.S.C. § 300g-3(g)(3) requires that he receive notice and a hearing before a civil penalty is assessed against him. Thomas claims that the Government failed to satisfy this requirement. Accordingly, he argues that the even if the Government's case is successful, it cannot recover a civil penalty from Thomas. This argument is based on a misinterpretation or misunderstanding of the relevant statute. Section 300-3(g)(3) applies when the Administrator of the EPA brings an administrative action against an individual. Here, the Administrator did not bring any such suit, nor did the Administrator impose a fine against the Defendants. Instead, the case was referred to the Department of Justice and a civil suit was filed, naming Thomas as one of several Defendants.

Equally unconvincing are Thomas' arguments: (1) that the 1998 Order is unenforceable because it expired in 2000, and (2) that this suit is barred by the statute of limitations. The Order expired in 2000, only if the Defendants maintained continuous compliance with it. The Government has presented adequate evidence of the Defendants' failure to comply with the Order between 1998 and 2000 to justify the Government's suit alleging violation of the Order. Moreover, the Government has clarified that it is seeking injunctive relief to remedy the Defendants' non-compliance with the SDWA, as well as monetary penalties for the five years preceding the institution of this suit. Therefore, the statute of limitations does not bar this suit.

## CONCLUSION

For the foregoing reasons, the Government's Motion for Summary Judgment (Docket No. 79) is **GRANTED IN PART AND DENIED IN PART**. The Defendant's Motion to Enforce the Settlement Agreement (Docket No. 122) is **DENIED**. The Court requests that the Magistrate Judge schedule a status conference with the parties at her earliest convenience.

SO ORDERED: 02/18/2011

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to:

Michael J. Menninger
Wood & Lamping, LLP
mjmenninger@woodlamping.com

Daniel Steven Tomson
Mercer Belanger
dtomson@indylegal.com

Shelese M. Woods
United States Attorney's Office
shelese.woods@usdoj.gov