**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No.1:07-cv-1167-WTL-DML** |
| | ) | |
| **THOMAS J. RITZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ENTRY ON REMEDY

Following the Court's entry of summary judgment in favor of the United States of

America and against Defendant Ronald Ritz, the Court ordered the parties to brief the issue of

remedy. Briefing is now complete and the issue is now ripe for ruling. Accordingly, the Court

rules as follows.

## I.  LEGAL STANDARD

The Safe Drinking Water Act ("SDWA") provides:

> The court may enter, in an action brought under this subsection, such judgment as
> protection of public health may require, taking into consideration the time
> necessary to comply and the availability of alternative water supplies; and, if the
> court determines that there has been a violation of the regulation or schedule or
> other requirement with respect to which the action was brought, the court may,
> taking into account the seriousness of the violation, the population at risk, and
> other appropriate factors, impose on the violator a civil penalty not to exceed
> $25,000 for each day in which such violation occurs.

42 U.S.C. § 300g-3(b).

Although the statute provides for a daily monetary penalty of $25,000, this amount has

subsequently been adjusted to account for inflation. Accordingly, violations occurring after

January 1, 1997 but before March 15, 2004 are subject to a daily penalty of $27,500. Violations

occurring after March 15, 2004 but before January 1, 2009 are subject to a daily penalty of $32,500. Violations occurring after January 1, 2009 are subject to a daily penalty of $37,500. 40 C.F.R. § 19.4, Table 1.

## II. BACKGROUND

The facts relevant to this matter were fully set forth by the Court in its August 25, 2010 Entry on Summary Judgment (Docket No. 105). Instead of restating these facts, the Court merely incorporates them as if they were fully set forth herein.

## III. DISCUSSION

As an initial matter, the Court notes that in his response brief, Defendant Ronald Ritz[1] implicitly seeks reconsideration of the Court's summary judgment ruling. In so doing, Ronald advances arguments that were expressly rejected by this Court when it entered partial summary judgment against Defendant Thomas Ritz. *See* Docket No. 132. Accordingly, to the extent that Ronald seeks reconsideration of the Court's Entry on Summary Judgment (Docket No. 105), the motion is **DENIED**.

### A. Civil penalty.

The Government argues that a $29,754.00 penalty is appropriate in this case. In arriving at this amount, the Government used the "top down" approach set forth in *United States v. B & W Investment Properties*, 38 F.3d 362, 365 (7th Cir. 1994). Pursuant to the top down method, the maximum statutory penalty is calculated and then a downward departure is made based on the presence of mitigating factors, if any.

---

[1] Hereinafter the Court will refer to Ronald Ritz as "Ronald" in order to distinguish him from his brother and co-defendant Thomas Ritz who will be referred to as "Thomas."

In the instant case, the Government asserts, and Ronald does not dispute, that there were a total of 58 violations. Specifically, Ronald failed to test the water at the Cottonwood Campground (the "Campground") for nitrate from 2004 through 2009, which resulted in 6 testing violations and 14 reporting violations. Ronald also failed to test the Campground's water for total coliform from 2004 through 2010, which resulted in 22 testing violations and 16 reporting violations.

The sheer number of violations yields a massive statutory penalty.[2] However, the Government expressly disclaims any request for a penalty near the statutory maximum. *See* Docket No. 108 at 5 (stating "even if the days of violations were reduced . . . the statutory maximum would be high relative to the [Defendant's] limited size and financial capacity"). Instead, the Government asks the Court to consider the factors used by the Environmental Protection Agency ("EPA") when calculating civil penalties in environmental cases. These factors include: (1) the seriousness of the violation; (2) the economic benefit, if any, resulting from the violation; (3) any history of violations and any good-faith efforts to comply with the applicable requirements; (4) the economic impact of the penalty on the violator; and (5) any other matters as justice may require. Ronald agrees that use of these factors is appropriate, however, he disagrees with the Government's application of the factors and the corresponding civil penalty.

### 1. Seriousness of the violations.

Both total coliform and nitrates are associated with serious health problems. The presence of total coliform in a water supply indicates that disease-causing organisms such as *E.*

---

[2] By the Government's calculation, the maximum penalty is $194,837,500.

*coli* or fecal coliform may be present in the water supply.  Exposure to these disease-causing bacteria is associated with gastrointestinal problems, headaches, and fatigue.  Children, the elderly, and immuno-suppressed individuals are especially susceptible to these bacteria and may become severely ill.  Young children may also suffer serious health problems as a result of nitrate exposure.

Given these serious health risks, as well as the Defendant's long-term failure to test the Campground's water supply, the Government asserts that a sizable penalty is appropriate in this case.

In response, Ronald asserts that as a result of this litigation he has begun testing the Campground's water supply and he will continue to do so "as a prudent safety measure."  Docket No. 120 at 9.  Ronald claims that the Government's requested penalty is "not in line with penalties imposed by other jurisdictions."  *Id*.  In support of this assertion, Ronald cites three cases: *United States v. Alder Creek Water Co.*, 823 F.2d 343, 344 (9th Cir. 1987), *In re Romero & Busot, Inc.*, 785 F. Supp. 27 (D.P.R. 1992), and *United States v. Rueth Development Co.*, 335 F.3d 598 (7th Cir. 2003).  Having reviewed these cases the Court concludes that none of them support Ronald's argument that the Government's requested penalty is excessive.  Instead, all three cases indicate that federal courts impose varying civil penalties, as well as other forms of relief, on defendants who violate environmental statutes.

Despite Ronald's contentions otherwise, the fact that no one got sick from consuming, bathing in, or otherwise using the Campground's water does not negate the serious nature of his conduct.  Patrons of the Campground were repeatedly exposed to contaminated water due to Ronald's failure to test the water supply.  Accordingly, this factor weighs in favor of a

substantial penalty like the one proposed by the Government.

### 2. Economic benefit resulting from the violations.

The Government concedes that Ronald derived "only a modest economic benefit from not conducting the required sampling and testing and reporting." Docket No. 108 at 11. Indeed "[t]he EPA estimates that the . . . total economic benefit over the relevant time frame was $626." *Id*. The Defendant makes much of this factor and emphasizes that "the United States is asking for a civil penalty of nearly thirty thousand dollars, a number which is more than **forty-seven times** the amount of economic benefit received from not testing the water." Docket No. 120 at 12-13. Based largely on this factor, Ronald then asks the Court to impose a penalty "roughly ten times that of the economic benefit received – an amount no greater than $7,500.00." *Id*. at 13.

The Court believes that given the Defendant's unwillingness to comply with EPA regulations and federal law, a more substantial penalty is necessary in order to deter the Defendant from engaging in similar conduct in the future. Accordingly, this factor also weighs in favor of the Government's proposed penalty.

### 3. History of violations and any good-faith efforts to comply with the requirements.

The Government emphasizes that "this case presents a long-standing history of a refusal . . . to comply with the SDWA." Docket No. 108 at 11. Moreover, according to the Government, the Defendant "has been aware of the violations for over a decade." *Id*. The Government claims that this "long history of non-compliance" justifies a substantial civil penalty.

Ronald does not deny that the Government attempted to contact him and repeatedly informed him that he had an obligation to test the Campground's water. His only explanation as to why he did not begin testing the water sooner was that he was involved in the instant

litigation. Indeed, Ronald's response states that "he still does not think the testing requirements apply to the campground." Docket No. 120 at 12. This is no justification. Although it is true that Ronald has now begun testing the Campground's water and he allegedly "intends to continue testing the water at the campground to make sure that the campers are protected," *id.*, this is not particularly persuasive given his long history of non-compliance.

### 4. Economic impact of the penalty on Ronald.

The Government asserts that the Campground generates approximately $30,000 per year. However, the evidence of record indicates that Ronald does not rely solely on this income to support himself and his family.[3] Based on this information, the Government avers that the Defendant could pay the requested $29,754 penalty.

Ronald does not dispute the assertion that he "does not rely on the income from the campground to support his family," however, he claims that "taking away the equivalent of an entire summer's gross income from the campground is unfair considering the seriousness of the violations and considering that Ronald Ritz has begun to do the required testing and intends to continue to do so." Docket No. 120 at 13. Instead, Ronald argues that it is more equitable "to take a portion of the summer's income" and "a civil penalty of approximately $7,500.00 would be the equivalent of 25% of the campground's annual income and would impose enough of a penalty to cause Ronald Ritz to want to continue to do the testing." *Id.*

The Court disagrees. Given Ronald's long history of non-compliance, as well as the seriousness of the violations, the Court believes that nothing other than a stiff penalty will have a deterrent effect. Thus, this factor weighs in favor of the Government's requested penalty.

_____

[3] Apparently Ronald owns other real estate, rental property, and farm land.

## 5. At-risk population.

The Government alleges that Ronald's failure to test the Campground's water jeopardized the health of between 100 and 160 individuals per day during the camping season. The Government bases this estimate on the fact that there were between 50 and 80 campsites and the assumption that at least two individuals camped together at any given time. The Defendant takes issue with this calculation because "[t]here is no evidence that the campground was full every day that it was open" and "[m]erely counting the number of lots . . . and multiplying time 2.5 people per campsite . . . is overly simplistic and may provide this Court with inflated numbers of campers." Docket No. 120 at 11. Moreover, Ronald claims that because the spigots were all labeled "non-potable" the campers were not really at much risk.

Even if that the Government's estimation of the number of campers present is inflated, the fact remains that any campers who consumed, bathed in, or otherwise used the Campground's water were potentially exposed to waterborne hazards. The fact that the Defendant labeled the spigots "non-potable" does not vitiate his behavior.

Having considered all of the relevant factors, the Court concludes that the civil penalty requested by the Government is reasonable given the facts of this case. Accordingly, Ronald Ritz is ordered to pay a civil penalty of $29,754.00.

## B. Injunctive relief.

The Government also requests an order enjoining Ronald from "ongoing and future violations of the Safe Drinking Water Act . . . and its implementing regulations" and requiring him to "comply fully with the Administrative Order which the U.S. EPA issued on December 2, 1998." Docket No. 108 at 13. The Government believes that absent this injunctive relief,

Ronald will continue to violate the SDWA.

Ronald does not object to the issuance of an injunction, however, he suggests several limitations. First, he requests that the Court "limit the number of years for the testing." Docket No. 120 at 14. Ronald would prefer that "the required testing be performed for three years including the years he has already completed the testing, and, if the results are acceptable for that amount of time, that Ronald Ritz may continue to do the testing if he wishes." *Id*. This request evidences a complete misunderstanding of the law. Testing the Campground's water is not optional. Pursuant to federal law it is mandatory. The Court cannot limit the testing because doing so would essentially invite Ronald to violate the law.

Ronald also takes issue with the 1998 Administrative Order (the "1998 Order") because he asserts that its factual findings are inaccurate. Although he may have issue with the factual findings of the 1998 Order, this does not affect his obligations under it (e.g., sampling and reporting). Moreover, many of his complaints are arguments regarding the Campground's status as a public water system, which the Court previously decided in its August 2010 Entry (Docket No. 105). The Court has expressly declined to reconsider that entry at this juncture.

Accordingly, the Government's requested injunctive relief is **GRANTED**. In addition to abiding by the terms of the 1998 Order, Ronald Ritz shall also do the following:

## NITRATE SAMPLING AND REPORTING

Each calendar year, during a time when the system is providing water, the Defendant must take a sample for nitrate at each entry point to the Campground's water distribution system, which is representative of each well supplying water to the water distribution system, and have each sample analyzed by a state certified lab. Defendant shall then send a copy of the results of

all nitrate samples to the EPA and IDEM. *See* 40 C.F.R. § 141.23.

If any nitrate sample collected from the Campground has nitrate greater than the Maximum Contaminant Level ("MCL") at 40 C.F.R. § 141.62(b) of 10 milligrams per liter (mg/l) nitrate reported as nitrogen (NO$_3$ as N), then the Defendant must complete the following additional actions:

1.   Within 24 hours of receiving the nitrate sample result greater than 10 mg/l, the Defendant shall have an additional nitrate sample collected, known as the confirmation sample, and analyzed by a state-certified laboratory. The results of the confirmation sample shall be averaged with the initial sample.

2.   If the average of the initial sample and the confirmation sample results in a sample result greater than 10 mg/l MCL for nitrate, known as an acute risk, the Defendant must:

   a.   notify the EPA and IDEM within 48 hours of receiving the results;

   b.   notify people staying at the Campground and the general public of the nitrate results within 24 hours of receiving the results; and submit to EPA and IDEM a copy of the public notice, *see* 42 U.S.C. § 300g-3(c);

   c.   initiate consultation with IDEM regarding the nitrate results within 24 hours of receiving the results; and

   d.   comply with any additional public notification requirements that may be established as a result of consultation with IDEM, within the time-frame established by IDEM. *See* 40 C.F.R. § 141.23.

**TOTAL COLIFORM SAMPLING AND REPORTING**

For each calendar quarter that the system provides water, the Defendant must take a sample for total coliform bacteria at each entry point to the Campground's water distribution system, which is representative of each well supplying water to the water distribution system, and have each sample analyzed by a state certified lab (known as a "routine sample"). Defendant shall then send a copy of the results of all total coliform samples to the EPA and IDEM. *See* 40 C.F.R. § 141.21.

If any total coliform bacteria sample collected from the Campground tests positive for total coliform bacteria, then the Defendant must complete the following additional actions:

1.  Upon receiving the positive sample results, the Defendant shall have the results further analyzed for the presence of fecal coliform and/or *E. coli*;

2.  Within 24 hours of receiving the positive sample results, the Defendant shall have 4 repeat samples collected and analyzed for total coliform bacteria by a state-certified laboratory, with one repeat sample to be collected from the sampling site where the original positive sample was taken and the other three repeat samples to be collected from three other sites;

3.  During the next calendar month when the system is in operation following a sample that produced a positive sample result, the Defendant shall have 5 additional routine samples taken. If more than one routine sample in the same month, or any repeat sample, tests positive for total coliform bacteria, and if any sample contains fecal coliform or *E. coli*, then this is considered an acute MCL violation for total coliform bacteria and the Defendant must:

    a.  notify the EPA and IDEM by the end of the next business day after

receiving the results;

b.    notify people staying at the Campground and the general public of the total coliform bacteria results within 24 hours of receiving the results, *see* 42 U.S.C. § 300g-3(c);

c.    submit to EPA and IDEM a copy of the public notice;

d.    initiate consultation with IDEM regarding the results within 24 hours of receiving the results; and

e.    comply with any additional public notification requirements that may be established as a result of consultation with IDEM, within the time-frame established by IDEM.

If more than one routine sample in the same month, or any repeat sample, tests positive for total coliform bacteria but does not contain fecal coliform or *E. coli*, then Defendant must notify people staying at the Campground and the general public of the total coliform bacteria results within 30 days of receiving the results. The notice must remain in place for at least 7 days, or as long as the violation persists. The Defendant shall also submit to EPA and IDEM a copy of the public notice. *See* 40 C.F.R. § 141.21.

## **CONCLUSION**

For the foregoing reasons, Defendant Ronald Ritz is assessed a civil penalty of $29,754.00 and is enjoined as set forth above. Final judgment will be entered in this case after the Government's claim against Defendant Thomas Ritz are resolved.[4]

---

[4] No party has claimed that judgment against Ronald Ritz should be entered pursuant to Fed. R. Civ. P. 54(b), which provides that the Court may direct entry of final judgment as to one or more, but not all parties, if the Court determines that there is no just reason for delay.

SO ORDERED: 05/03/2011

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to:

Michael J. Menninger
Wood & Lamping, LLP
mjmenninger@woodlamping.com

Daniel Steven Tomson
Mercer Belanger
dtomson@indylegal.com

Shelese M. Woods
United States Attorney's Office
shelese.woods@usdoj.gov

---

Accordingly, the Court will not enter final judgment until the claims against Thomas Ritz are resolved.